UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
401 West A Street, Suite 800
San Diego, California 92101

| | |
|---|---|
| File No.: A75 513 802 | Date: February 10, 1999 |
| In the Matter of | |
| Ernesto RIVAS Lopez, Respondent | IN REMOVAL PROCEEDINGS |

ON BEHALF OF THE RESPONDENT:

Bill Waddell, Esquire
1551 Fourth Ave., Suite 801
San Diego, California 92101

ON BEHALF OF THE SERVICE:

David Orland, Esquire
880 Front Street, Room 2246
San Diego, California 92101

**CHARGE:** Section 212(a)(6)(A)(i) of the Act; (alien present without being admitted or paroled).

**APPLICATIONS:** Asylum and withholding of removal.

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

*I. Procedural History*

Respondent is a native and citizen of Mexico. He entered the United States in the summer of 1988 with a border crossing card. Since 1988, respondent has been twice returned to Mexico by the Immigration and Naturalization Service (Service) after being stopped at Service checkpoints in the San Diego area. Respondent last entered the United States on or about April 15, 1993.

On April 1, 1998, respondent filed an asylum application with the Service. On May 12, 1998, he attended an asylum interview. On May 26, 1998, the Service referred respondent's case to the Court and filed a Notice to Appear (NTA) charging him with removability pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality Act (Act), as an alien present in the United States without being admitted or paroled. On May 27, 1998, the Service served upon respondent the NTA.

On August 13, 1998, respondent, through counsel, appeared at a master calendar hearing wherein he admitted the factual allegations contained in the NTA and conceded removability.

He also indicated his intention to seek relief from removal in the form of asylum and withholding of removal or, in the alternative, voluntary departure. The Court directed Mexico as the country for removal purposes.

On January 13, 1999, respondent, through counsel, appeared at his merits hearing. Based upon his admissions, the Court determined that he was removable by clear and convincing evidence. Section 240(c)(3) of the Act.

## II. Statement of Facts

The respondent is a 29-year-old homosexual male who is a native and citizen of Mexico. He has tested positive for the Human Immunodeficiency Virus (HIV). He was born and raised in Ciudad Obregon, Sonora. He testified that beginning in the first grade, he was badgered by other children because he was gay. Throughout the majority of his adolescence, respondent was raped and abused by two Mexican police officers until he left Mexico when he was 18 years old. In addition, he was raped by soldiers from the Mexican army. According to his testimony, because of these experiences, he considered it normal, as a homosexual, to be treated poorly. It was not until he visited the United States in the summer of 1988, and observed how homosexuals lived here, that respondent realized that these experiences were not normal or acceptable.

He testified that when he was 9 years old, one of his male coaches at a physical education training camp followed him into the bathroom and attempted to rape him. Respondent testified that he did not report the incident because he was ashamed. According to his testimony, his first encounter with the Mexican police occurred when he was 11 years old. Respondent and a friend, Ramon Rodriguez, were walking down the street when they were stopped by two police officers. Respondent was wearing a belt with handcuffs on it and the police asked him to give it to them. When he refused, the officers took him inside their car and drove him to the outskirts of town and raped and beat him. He testified that after the police forced him to disrobe, they penetrated him with their fingers and penises. The officers called him names like "queer" and "faggot."

Respondent testified that after they left him, he returned home confused and afraid. He did not tell his father because not only was he ashamed, but he also feared the officers would take reprisals against him. According to respondent, he had known of the police retaliating against people in his town. In particular, he asserted that after the police killed his sister's boyfriend, whose parents pressed charged, their cars and business were mysteriously vandalized.

According to his testimony, a few weeks after this first incident with the police, the same two officers saw him walking down the street near an isolated sports area and forced him to get into their car. Respondent testified that the police took him to a house and forced him to perform oral sex on them.

Respondent testified that during 1981 and 1982, the same two officers forced him to go with them 5 or 6 times. On some occasions, the police forced him to play Russian Roulette with

A75 513 802                                    2                              February 10, 1999

their guns. He testified that the officers would place their guns at his head or in his mouth and would then spin the cylinder of the revolver and force him to pull the trigger. The police often took respondent's money.

On one occasion, while respondent and his two friends, Christian and Toli, were strolling in the town square, the same two officers picked them up and took them to the outskirts of the city. The officers raped all three of them and forced respondent to perform oral sex on them. Respondent averred that he did not tell anyone of this incident because he "felt ashamed" and "dirty." He testified that this was especially true with respect to his father, which made it very difficult to develop a close relationship with him.

During another episode with the same two officers, in the fall of 1982, after respondent resisted them and tried to fight back, one of the officers kicked him numerous times in the testicles. Respondent testified that as a result, he was hospitalized and had to undergo surgery, where he lost one of his testicles. He explained to his parents that he had fallen off of his bicycle. Respondent stated that he told no one at the hospital what had really happened. When questioned by the Court as to why he did not provide a hospital report from Mexico confirming this, he responded that he had attempted to obtain something from the hospital but was unable. Respondent testified that he called his mother and requested her to send him hospital reports relating to the incident. He told her that he needed the report for medical treatment that he is currently undergoing. When she attempted to obtain the reports, however, hospital personnel informed her that they no longer had said documents.

Respondent testified that when he was 14 years old his parents sent him to a psychiatrist because they noticed that he was "different." He explained that he was "different" in the way he dressed and the games that he played. In particular, respondent testified that he liked sports, such as volleyball, that were considered feminine. He did not like traditional masculine sports such as football and baseball.

Respondent went to the psychiatrist once a week for approximately six months. He testified that he never told the psychiatrist about the rapes or abuses by the police because he did not trust him. Eventually, he stopped going after the psychiatrist recommended that he undergo hormonal treatment. Respondent testified that his mother was opposed to this, while his father was in favor of it.

In 1983, respondent and some male friends, who were also gay, went to a different city in Mexico. He testified that they were harassed by police, who took their money. The police did not, however, sexually abuse them. Nonetheless, respondent testified that he did not remain there because he was only 13 years old and needed to return home to his family and to attend school.

According to his testimony and asylum application, between 1983 and 1988, respondent was arrested by the two police officers on several occasions on false charges of public

A75 513 802                                    3                              February 10, 1999

misconduct, stealing and prostitution. He testified that he was never brought to court or convicted of any such offenses. According to respondent, these spurious charges were simply a predicate for the police arresting him and subsequently abusing and raping him.

When respondent was approximately 16 years old, he was raped by officers from the Mexican army. He testified that one evening, while he and two male friends were coming out of a movie theater, four soldiers outside of the city hall building asked one of his friends for a cigarette. When his friend attempted to give them a cigarette, the soldiers told them that they were trespassing on government property. Thereafter, the soldiers forced them into the closed city hall building and raped them. Respondent testified that he did not go with the officers on his own free will, but did not resist them because he feared they would call the police. Two soldiers raped respondent, forcing him to engage in both oral and anal sex with them.

On another occasion, respondent encountered additional problems with members of the Mexican army. He testified that when he and some male friends applied for the military draft, army members pushed and kicked them, spit on them and pulled their hair. According to his testimony, the soldiers targeted them because they were homosexual. He stated that they called them "queers" and "faggots." Respondent testified that the soldiers knew he and his friends were gay by their long hair, their mannerisms and gestures, their speech and by the way they walked. According to respondent, the soldiers always harassed homosexuals. Respondent testified that other members of the military, including what appeared to be superiors, did nothing to prevent this harassment.

In the summer of 1988, when respondent was 18 years old, he came to San Diego, California with a border crossing card to visit a male friend living here. Respondent testified that after he discovered how homosexuals live here, he decided to remain in the United States. He explained that homosexuals are able to live here without harassment by the police. Respondent testified that living in the United States has been his only opportunity to live "an almost normal life" as a homosexual.

Respondent was diagnosed with HIV in March of 1994. When asked by the Court why he did not provide medical documentation confirming this, he responded that he did not think it was necessary. He testified that he has been taking the "cocktail" – HIV treatment drugs – for the past two years. Respondent pays for these drugs through funds from the Ryan White Foundation, which is a private source. Respondent's closest friend in Mexico, Ramon Rodriguez, died from the HIV virus and he knows of approximately five or six other friends who have also died there from the disease.

According to his testimony, to have HIV in Mexico is considered an "embarrassment." He stated that people who are HIV-positive in Mexico do not admit that they have the disease. Respondent testified that because people are ignorant about the disease, he fears returning to Mexico.

A75 513 802                                    4                              February 10, 1999

Respondent testified that in 1988, he voluntarily departed the United States after the Service discovered him at a checkpoint. This occurred again in 1993. According to his testimony, respondent did not explain to the Service officers his fear of returning to Mexico because he was afraid that if he told them he was a homosexual, they would deny him any opportunity to obtain lawful status in the United States. Moreover, he explained, he did not believe it possible for a gay person to gain asylum in this country.

Respondent asserted that he has heard of other homosexuals in other cities in Mexico enduring similar abuses as he did. He testified that he learned of this through friends in Mexico. He testified that he knew of approximately ten to twenty others who experienced comparable treatment at the hands of the police.

Respondent testified that he fears returning to Mexico because of the abuses and rapes that he suffered. He believes that his situation will only be exacerbated by the fact that he is now HIV-positive. In support of his application for asylum, respondent has submitted the following:

(1) Department of State, Country Reports on Human Rights Practices for 1996, Mexico.
(2) 'Breaking the Silence,' Amnesty International Report, 1997.
(3) NACLA Report on the Americas, March/April 1997.
(4) 'Violence Unveiled: Repression Against Lesbians and Gay Men in Latin America,' Inter-Church Committee on Human Rights in Latin America (ICCHRLA), April 1996.
(5) 'Police Launch Wave of Repression in Chihuahua, Mexico,' Emergency Response Network, International Gay and Lesbian Human Rights Commission, April 1995.
(6) 'Killings of gay men in Chiapas: the impunity continues,' Amnesty International Report, October 1994.
(7) 'Anti-gay violence up in Mexican state of Sinaloa,' Outlines, August 1994.
(8) 'Democracy and Human Rights in Mexico,' North America Project of the World Policy Institute.
(9) 'Mexicans With Aids Battle Prejudice,' Mexico NewsPark, Dec. 6-9, 1993.
(10) 'More Killed in Mexico,' COLORLife, April 1993.
(11) 'Mexican activists demand full investigation of murders of gay men,' The Advocate August 1992.
(12) 'Mayor Kills Gay Meeting.'

According to the Department of State Country Reports on Human Rights Practices, Amnesty International cites Mexico as one of the countries in which homosexual men and women are most likely to be victims of violence and abuse. (Exh. 2). The report discusses the deaths of at least twelve homosexuals between 1991 and 1993.

The Amnesty International article, 'Breaking the Silence,' examines the killings of transvestites in Mexico between 1990 and 1995 and the lack of investigation into such murders. *Id.* In fact, the article states that investigations were "blocked throughout by officials, and

A75 513 802                                     5                                     February 10, 1999

marred by torture, corruption, death threats to witnesses, cover-ups and forced confessions." *Id.* The evidence indicated that the actual perpetrators "acted with the tolerance and complicity of Mexican authorities." *Id.*

The same article addresses the gay killings in the city of Tuxtla Guterriez in the State of Chiapas between 1991 and 1994. Of the twelve gay men who were killed, nine were shot, one was stabbed and two were beaten to death, in what the report refers to as a "pattern of violence directed against the gay community in this area." *Id.* A 1994 report from the Department of Human Rights of the Archdiocese of Mexico reported that over thirty gay men had been killed between 1991 and 1994, with possible state involvement. *Id.*

According to an article, dated March/April 1997, the local governing right-wing National Action Party in Guadalajara, Mexico, recently passed a local ordinance outlawing "abnormal sexual behavior." *Id.* This renews the power of local police to arrest homosexuals and makes extra-legal police practices, such as extortion, more likely to occur. *Id.*

According to an August 1994 article, homosexuals and transvestites in the Mexican state of Sinaloa are under increased attack from police. *Id.* The article states that since 1992 seventeen gays and transvestites have been murdered. *Id.*

A report prepared by the North America Project of the World Policy Institute, 'Democracy and Human Rights in Mexico,' states that the Mexican government has permitted extrajudicial executions of gay men and transvestites by local police forces and vigilantes. *Id.* The same report cites the February 1993 Human Rights Department of the Archdiocese of Mexico City report, which states that there is strong evidence of an anti-gay campaign that has been waged by various police corporations, including possibly the army. *Id.*

Respondent has also presented evidence that there are virtually no health services offered in Mexico for AIDS sufferers. *Id.* According to the article, 'Mexicans With Aids Battle Prejudice,' dated December 1993, victims of the disease often encounter fear based on ignorance. *Id.* The article states that social taboos on homosexuality not only contribute to public ignorance, but may also be helping to spread the disease. *Id.*

### III. Application for Asylum and Withholding of Removal

#### A. Statutory Eligibility for Asylum

An asylum applicant bears the evidentiary burden of proof to establish his or her asylum claim. 8 C.F.R. § 208.13(a) (1998). To establish eligibility for a grant of asylum under section 208(a) of the Act, the applicant must demonstrate that he is a refugee within the meaning of section 101(a)(42)(A) of the Act. The term "refugee" means:

> any person who is outside any country of such person's nationality

A75 513 802                                    6                              February 10, 1999

or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...

Section 101(a)(42)(A) of the Act.

The well-founded fear standard comprises both a subjective and an objective element. The applicant must demonstrate that his fear of persecution is both subjectively genuine and objectively reasonable. *Blanco-Comarribas v. INS*, 830 F.2d 1039 (9th Cir. 1987); *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986). The objective component requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the applicant faces persecution. *Diaz-Escobar v. INS*, 782 F.2d 1488 (9th Cir. 1986).

Persecution has been defined as the infliction of suffering or harm upon those who differ in a way that is regarded as offensive. *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996); *Kovac v. INS*, 407 F.2d 102 (9th Cir. 1969). Persecution can be inflicted by a government or by one of its agencies, or by groups outside the control of the established government that have the will and means to carry out persecution. *McMullen v. INS*, 658 F.2d 1312, 1315 (9th Cir. 1981). For the harm or suffering to be considered persecution, it must be inflicted either by the government or by persons or organizations the government is unable or unwilling to control. *Sing v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996). The 9th Circuit has concluded that rape and sexual assault can constitute persecution within the meaning of the Act. *Lopez-Galarza v. INS*, 99 F.3d 954 (9th Cir. 1996); *Lazo-Majano v. INS*, 813 F.2d 1432 (9th Cir. 1987) (overruled on other grounds by *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996).

In order for an applicant to meet his or her burden of establishing past persecution, the applicant's credible testimony, if plausible in light of the general conditions of his country, may be sufficient to sustain the burden of proof without corroboration. *In re H-*, Int. Dec. 3276 (BIA 1996); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987); *see also Matter of Dass*, 20 I&N Dec. 120 (BIA 1989). Where an alien's testimony is the only evidence available, it can suffice if such testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the applicant's alleged fear. *Matter of Dass, supra* 124.

However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to material elements of an asylum claim, such evidence should be provided by the application. *In re M-D-*, Int. Dec. 3339 (BIA 1998) (quoting *In re S-M-J-*, Int. Dec. 3309 (BIA 1997). The failure to provide such evidence can result in the conclusion that the applicant has failed to meet his or her burden of proof. *Id.*

A75 513 802                                    7                                  February 10, 1999

A finding of past persecution gives rise to a regulatory presumption that the applicant has a well-founded fear of future persecution. 8 C.F.R. §208.13(b)(1); *and see Matter of Chen,* 20 I&N Dec. 16 (BIA 1989) (past persecution alone can be sufficient to meet the refugee definition). If an applicant establishes that he has been persecuted in the past on account of one of the enumerated grounds, a presumption arises that he has a well-founded fear of future persecution and the burden then shifts to the government to show, by a preponderance of the evidence, that "since the time the persecution occurred conditions in the applicant's country...have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." 8 C.F.R. § 208.13(b)(1) (1998).

In select cases, the Board has held that an applicant may, as a matter of discretion, be granted asylum solely on the basis of the severity of the past persecution. *See Matter of C-Y-Z-.* Int. Dec. 3319, at 6 (BIA 1997); *Matter of H-,* Int. Dec. 3276, at 16 (BIA 1996); *Matter of B-,* Int. Dec. 3251, at 10 (BIA 1995). Moreover, there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution. *Matter of Chen,* 20 I&N Dec. 16, 19 (BIA 1989).

An applicant for asylum must also demonstrate that the persecution he experienced in the past, or that is feared in the future, is on account of one of the five enumerated grounds outlined in section 101(a)(42)(A) of the Act. The Board has interpreted the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1986); *Matter of Mogharrabi, supra.* In *Matter of Acosta,* the Board set forth the following to develop what may constitute a "particular social group:"

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

In *Matter of Toboso-Alfonso,* 20 I&N Dec. 819 (BIA 1990), the Board held that an applicant who had the status of being a homosexual from Cuba established his membership in a particular social group within the meaning of the Act. In *Toboso,* the evidence presented by the applicant established that gays in Cuba were persecuted by the government, not based on any particular misconduct, but rather, based on their status as homosexuals alone. *Id.*
On June 16, 1994, the Attorney General designated *Toboso* as precedent in cases involving homosexuals who are persecuted by their governments. In a memorandum announcing the

*Toboso* designation, the Attorney General stated:

> The case holds that an individual who has been identified as homosexual and persecuted by his or her government for that reason alone may be eligible for relief under the refugee laws on the basis of persecution because of membership in a particular social group.

See 71 *Interpreter Releases* 860 (July 1, 1994).

The Service, as well, has granted asylum to several gay men based on their membership in a "particular social group." In 1994, the Service granted asylum to a Mexican national because he established a well-founded fear of persecution on account of his sexual orientation. *See* 71 *Interpreter Releases* 490 (April 11, 1994). The applicant presented testimony that since he was a child, he had been sexually abused, raped, beaten, harassed and ostracized because he was gay. *Id.* He testified that as an adult, the Mexican police arrested him on numerous occasions solely because he is gay, falsely accused him of crimes, beat him, and on one occasion extorted money from and raped him. *Id.*

In another case involving a Turkish gay man, the Service granted his application for asylum. *See* 71 *Interpreter Releases* 1515 (November 14, 1994). In this case, the applicant asserted that he had been harassed, beaten, persecuted and raped several times, both by Turkish police and by street gangs, because he is gay. *Id.* (citing *Washington Blade*, Oct. 28, 1994, at 1).

On August 13, 1996, the Service granted asylum to a gay Brazilian man, who is infected with HIV. *See* 73 *Interpreter Releases* 1140 (August 26, 1996). The grant was on the basis of sexual orientation, not his HIV status. *Id.* The applicant testified that in Brazil, there is such intense hatred and violence against actual or suspected homosexuals by the government, its police, death squads and society that he was forced to flee the country. *Id.* He described various incidents of rape and detention at the hands of the police. *Id.*

### B. Statutory Eligibility for Withholding of Removal

To establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act, an applicant must demonstrate a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407 (1984). This means that the applicant must establish that it is more likely than not that he would be subject to persecution for one of the grounds specified in the Act. *Id.*

### C. Respondent's Arguments

In his closing statement, respondent, through counsel, argued that the rape and abuse he

endured at the hands of government agents, the Mexican police and soldiers, rises to the level of past persecution. He asserted that this past persecution gives rise to a presumption of future persecution, thereby shifting the burden to the Service to prove that country conditions affecting gays and lesbians in Mexico have sufficiently changed. Respondent pointed to the documentary evidence, including the Department of State Country Reports and the Amnesty International Reports, which indicate that conditions have not changed and that homosexuals remain exposed to abuse.

Respondent also contended that even if he no longer had a well-founded fear of future persecution, based on *Matter of Chen*, the past persecution he suffered alone entitles him to a grant of asylum. In addition, he argued that because the persecution was inflicted by governmental officials, an assumption arises that such persecution is countrywide.

Respondent further asserted that prior to 1990, being a homosexual was a ground of exclusion. Therefore, explaining to the Border agents who gave him voluntary departure why he feared returning to Mexico would have been not only futile, but also certain to result in his exclusion.

### D. Service's Arguments

In closing, the Service argued that various aspects of respondent's story are "incredible." Therefore, he has not concretely established that he suffered past persecution. In particular, the Service pointed out that respondent never sought assistance nor did he ever tell anyone about the abuse he endured. Moreover, the Service noted, despite the years of abuse, he was still able to finish high school on time. The Service questioned his ability to carry on a "normal existence" and also found it curious that none of respondent's teachers or family ever noticed anything unusual.

According to the Service, an applicant for asylum must be fleeing persecution. Respondent, on the other hand, came to the United States for a vacation, to visit a friend. The Service observed that respondent intended to return to Mexico. Therefore, the Service argued, he must not have been fleeing persecution.

The Service further maintained that the last abuse respondent endured occurred more than ten years ago and that there is no evidence indicating that the abusers will seek respondent out again. Because respondent's family is affluent, the Service questioned his failure to tell them about his abuse, since they may have had the ability to influence the police.

Finally, the Service argued that respondent does not merit a favorable exercise of discretion. The Service reiterated the fact that respondent came to the United States on a vacation. According to the Service, respondent came here to make a lifestyle change because life for homosexuals is better in the United States. The government again pointed out the he never told the border patrol agents about his fear of returning to Mexico.

A75 513 802                                10                                February 10, 1999

*E. Conclusion*

At the outset, the Court finds respondent's testimony believable, consistent and sufficiently detailed. The Court notes that his testimony was consistent with his application for asylum and supporting declaration. In addition, based on the evidence submitted by respondent, the Court concludes that his testimony is plausible in light of the general conditions of his country. *See In re H-, supra.*

The Court finds that respondent has suffered past persecution on account of his status as a homosexual. Throughout his adolescence, he was harassed, raped and abused at the hands of the Mexican police. He was also arrested on various occasions on false criminal charges. He was also harassed and raped by members of the Mexican army. Like the applicant in *Toboso*, the Court is satisfied that respondent was targeted by these governmental agents based on his sexual orientation, not because of any particular conduct he may have engaged in. Often, these governmental agents would refer to him as "queer" or "faggot." As detailed above, the documentary evidence presented by respondent supports his account.

Based on the atrocious persecution respondent suffered in Mexico, the Court believes that, as a matter of discretion, respondent is entitled to a grant of asylum solely on the basis of the past persecution. However, even if such discretion were not warranted here, the Service has failed to rebut the presumption that respondent will face persecution if he returns to Mexico. The evidence of record portrays numerous instances of continued murders, rapes and abuses of homosexuals in Mexico. Based on such evidence, the Court finds that respondent has a well-founded fear of future persecution.

According to the Service, because respondent was not "fleeing" persecution when he originally came to the United States, but instead came to visit a friend, he is not deserving of asylum as a matter of discretion. As respondent pointed out, however, at the time he entered, in 1988, homosexuals were excludable pursuant to section 212(a)(4) of the Act, as persons suffering from a psychopathic personality, sexual deviation or mental defect. At that time, not only did this country exclude persons like respondent, but it certainly did not recognize them as potential refugees.

Moreover, respondent testified that as a gay person in Mexico, he considered it normal to suffer the kinds of abuses that he did. It was not until he arrived in the United States and observed the manner in which homosexuals were able to live here did he decide that he was unable or unwilling to return to Mexico.

The Court is also satisfied that the persecution respondent endured was at the hands of government agents. Although respondent never informed the authorities about the rapes and abuses he suffered at the hands of the police, the evidence of record indicates that doing so would likely have been futile. For example, according to the Amnesty International Article, 'Breaking the Silence,' investigations into the murders of gays and transvestites in Chiapas were blocked by

officials and other authorities. In fact, as noted above, the evidence in those cases indicated that the perpetrators acted with the tolerance and alliance of the Mexican authorities. This is only one of numerous examples discussed above regarding the government's failure to control such persecution and its possible involvement therein.

In addition, when respondent went to sign up for the military draft, he was harassed and abused by members of the Mexican army. He testified that other members who were present, including what appeared to be their superiors, did nothing to stop the attack.

Because the persecution of respondent was from governmental agents, he is not required to show that he would be unable to reside in other areas of Mexico. *Singh v. Ilchert, supra*. Moreover, based on the evidence presented by respondent, Ciudad Obregon is not the only area in Mexico where gays are persecuted to the point of death.

Finally, although respondent has not presented any personal corroborating evidence, the Court is satisfied with his reasons for failing to do so, as detailed above. He has, on the other hand, submitted a significant amount of evidence regarding country conditions in Mexico, which support his account of the persecution he endured. This evidence also supports the Court's finding that respondent suffered past persecution by persons the Mexican government is unable or unwilling to control on account of his status as a homosexual. The Court therefore concludes that respondent has sustained his burden of proof in establishing that he is a refugee within the meaning of the Act. *See In re H-, supra; Matter of Mogharrabi, supra; Matter of Dass, supra*. The Court also finds that respondent merits a favorable exercise of discretion based on the severity of the past persecution he suffered. Because respondent is eligible for and deserving of asylum, the Court does not need to reach the issue of withholding of removal. Accordingly,

**IT IS ORDERED** that respondent's application for asylum is hereby granted.

ANTHONY ATENAIDE
U.S. Immigration Judge

cc:   Mr. Waddell for the Respondent
      Mr. Orland for the Service

A75 513 802                              12                         February 10, 1999