LAW OFFICE OF KURT DAVID HERMANSEN
KURT DAVID HERMANSEN, Cal. Bar No. 166349
110 West C Street, Suite 1810
San Diego, California 92101-3909
Telephone:    (619) 236-8300
Facsimile:    (619) 236-8400
Cellular:     (619) 436-8117
KDH@KurtDavidHermansen.com
Attorney for Defendant
ERNESTO RIVAS LOPEZ

SAN DIEGO SUPERIOR COURT

| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. _____ |
|---|---|
| Plaintiff, | ) Superior Court No. SCD187886 |
| v. | ) |
| ERNESTO RIVAS LOPEZ, | ) DECLARATION OF **ERNESTO RIVAS LOPEZ** |
| Defendant. | ) |

Under penalty of perjury, I, Ernesto Rivas Lopez, declare as follows:

1. I was willing to testify at trial, but my trial attorney (public defender Neil Besse) told me not to testify even though I had no prior convictions.

2. If I had known before going to trial that there were alternatives that would not create the devastating immigration consequences I now face, I would have insisted that my attorney do everything possible to help me avoid certain deportation.

3. I agreed to go to trial because I was told there was not alternative plea possible that would give me the chance of not losing my asylum.

4. I was never informed of any possible plea that would have given the immigration judge the discretion to decide if I could retain my asylum.

5. If I had know that Counts 1, 2 and 3 were considered "aggravated felony" convictions for immigration purposes and that only those counts would automatically disqualify me from retaining my asylum, I would have asked my attorney to defend the case in every way possible to avoid or at least minimize the adverse immigration consequences to me.

6. I would have asked my attorney to use the immigration consequences to request that the charge be changed to simple possession or to an equivalent non-aggravated felony offense.

7. I would have offered to serve more time in custody if necessary to eliminate the possibility of mandatory deportation.

8. If necessary, I would have taken the case to trial, but would have presented evidence and testimony to show the jury that I did not possess drugs for sale, that some of the drugs belonged to other men, and that the syringes were not mine.

9. When I was in the Central Jail in May and June of 2005, leading up to my trial, my trial attorney visited me only one time.

10. My trial attorney never had an investigator or anyone else from his office talk to me.

11. My trial attorney was aware of my immigration status (i.e., that I was here with asylum).

12. My trial attorney never advised me of the immigration consequences of having an "aggravated felony" under 8 U.S.C. § 1101(a)(43).

13. I was granted asylum in 1999.

14. My trial attorney never told me that a conviction for "possession for sale" is an aggravated "drug trafficking offense" under 8 U.S.C. § 1101(a)(43).

15. My trial attorney never told me what an "aggravated felony" was for immigration purposes.

16. My trial attorney never discussed with me the crucial need to avoid an "aggravated felony" conviction in order to avoid losing my asylum.

17. My trial attorney never told me that the "possession for sale" counts were the counts that would result in me losing my asylum.

18. If I had known before trial that a conviction on the possession-for-sale charges would result in my deportation, I would have exercised my right to testify at trial in my defense to show I was innocent of those charges.

19. Although I would have subjected myself to cross-examination on my drug use and possession, I nevertheless would have testified so the jury could hear evidence from me and other witnesses that I was using, but not selling drugs.
20. Since first coming to this great country and realizing the freedoms and protections it affords, my goal was to remain here legally.
21. If my public defender had advised me of the harsh consequences that an aggravated felony brings in immigration court, I would have done everything possible to fashion a favorable plea or trial strategy to minimize my chances of being deported.
22. I also would have presented evidence and witnesses in my defense to show I did not possess drugs for sale and was not selling drugs to anyone.
23. If my trial attorney had properly advised me, I could have testified about drug use and the drug parties that took place in my apartment at 3751 Third Avenue, Apartment D, San Diego, CA, or I could have presented numerous witnesses to testify on my behalf.
24. I never saw anyone buy or sell drugs in that apartment.
25. As far as I know, drugs were never sold in that apartment while I lived there.
26. I did see people use drugs in that apartment.
27. The scale found in the apartment was not mine.
28. The Ketamine found in the apartment was not mine.
29. The cocaine found in the apartment was not mine.
30. The apartment was a place where people would meet, hang out and use drugs.
31. Many different guys would leave there stuff, including drugs, in that apartment.
32. I have been present at that apartment when people, were using drugs.
33. I have never used a syringe to inject drugs.
34. I have never possessed a syringe.
35. I have never sold drugs to anyone.
36. I have used drugs, but did NOT sell them.
37. I used to use drugs, but I am clean and sober now.

38. Other people often left illicit drugs at the apartment in the plastic set of drawers so that they could use the drugs at a later time.

39. I cut hair for a living and thus often have cash on hand because my clients often pay cash.

40. Before my arrest in this case I had a cosmetology license and was cutting hair for a living.

41. In December 2004 I was working for Red Hair Salon at 449 University Avenue, Suite 26, San Diego, CA 92103.

42. At my trial, a seemingly suspicious 38-page phone bill was used against me at trial to imply I was engaging in drug sales.

43. My attorney allowed the jury to be left with the uncontested impression that I was selling drugs given that I had a 38-page phone bill.

44. If I, or one of my friends, had testified at trial, the jury would have learned that the large phone bill was not suspicious given that: (1) it was my cellular phone bill; (2) I had no land-line home phone; (3) I used that cell phone for work; (4) I also used that cell phone for personal calls; (5) my friends called me and I called them on that phone number; (6) my family called me and I called them on that phone number; and (7) my hair-styling clients called me and I called them on that phone.

45. My December 29, 2004 arrest was shortly before New Year's Eve.

46. Some friends of mine and I were supposed to go to West Hollywood, California, to "party" to celebrate the new year.

47. The quantity of drugs at my apartment was such, in part, because we were going to party using those drugs.

48. I work at Winn's Barber Shop located at 445 University Avenue, San Diego, CA, as a hair stylist on a full-time, independent contractor basis.

49. While in jail for this case serving my 365 day sentence, I attended 26 hours of Alcoholics Anonymous (AA) meetings, 5 hours of AIDS education, and 51 hours of Narcotics Anonymous (NA) meetings.

50. After being released from jail, I successfully completed the Stepping Stone Extended Services Day Treatment Program on April 27, 2006, and was awarded a Certificate of Achievement for the accomplishment.

51. I am currently attending meetings of AA (Tuesdays and Saturdays), NA (Mondays, Wednesdays, and Fridays) and CMA (Crystal Meth Anonymous) (Thursdays and Sundays), and am enjoying a clean, sober and productive life.

I so declare this 31st day of August, 2006 in San Diego California.

_____
Ernesto Rivas Lopez
Declarant

-5-